IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| BARBARA E. MCDONALD, | ) | |
| | ) | |
| Plaintiff | ) | Civil No. 08-1250-MO |
| | ) | |
| v. | ) | OPINION AND ORDER |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MOSMAN, J.,**

     Plaintiff Barbara McDonald challenges the Commissioner's decision finding her not disabled under Title II of the Social Security Act and denying her application for Disability Insurance Benefits ("DIB"). The Court has jurisdiction under 42 U.S.C. § 405(g).

     I review the Commissioner's decision to ensure the Commissioner applied proper legal standards and that his findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). For the reasons stated below, I AFFIRM the Commissioner's decision.

## PROCEDURAL BACKGROUND

Ms. McDonald protectively filed for DIB and Supplemental Security Income ("SSI")

under Titles II and XVI of the Social Security Act on January 2, 2001. AR 115-17, 364-67, 610.[1]

After the Commissioner denied these applications, an Administrative Law Judge ("ALJ") held a

hearing on May 28, 2002 and found Ms. McDonald not disabled on July 31, 2002. AR 15-25, 28-

64, 72-74, 84-85. The Appeals Council denied review, and Ms. McDonald subsequently appealed

to this court, which issued a remand order pursuant to sentence four of 42 U.S.C. § 405(g). AR 6-

7, 407, 610. Another hearing was held on October 13, 2004. AR 554-606, 610. Following a

second unfavorable decision issued on March 21, 2005, Ms. McDonald again appealed to this

court. AR 610, 647-662. The second ALJ's decision was reversed and remanded for further

proceedings because the decision failed to consider opinions from state agency physicians who

examined Ms. McDonald. AR 610, 664-65. Additional hearings were held before a third ALJ on

August 15, 2007 and March 6, 2008.[2] AR 610, 825-907. The ALJ denied DIB and SSI on June

26, 2008. AR 610-19. The Commissioner's decision became final on August 25, 2008, and Ms.

McDonald timely appealed to this court on October 24, 2008. AR 607-09.

## THE ALJ'S FINDINGS

The third ALJ made her decision based upon the five-step sequential process established

by the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987); *see also* 20 C.F.R. §§

---

[1]  Citations to "AR" refer to indicated pages in the official transcript of the administrative record filed with the Commissioner's Answer on March 10, 2009 (#5).

[2]  The March 6, 2008 hearing was held to expand the record and accommodate examination by Dr. Dickinson, a neuropsychologist, and Dr. Ogisu, an orthopedist. AR 787-800, 802-812.

404.1520, 416.920 (establishing the five-step evaluative process for DIB and SSI claims). The

ALJ found that Ms. McDonald had severe impairments from "degenerative disc disease,

degenerative joint disease, an adjustment disorder, and possible fibromyalgia," but also found

that none of these impairments, either separately or in combination, met or equaled a disorder

listed in the Commissioner's regulations. AR 613.

After evaluating the record, the ALJ assessed Ms. McDonald's residual functional

capacity ("RFC"):

> [T]he claimant has the residual functional capacity to perform light work . .
> . except claimant is limited to lifting up to 20 pounds occasionally. Claimant
> is able to sit for 4 hours in an 8-hour day for 30 minutes at a time. Claimant
> is able to stand/walk for 4 hours in an 8 hour day for 30 minutes at a time.
> Claimant may not reach overhead with her right upper extremity. Otherwise,
> she can occasionally push/pull with either extremity. Claimant is able to
> occasionally operate foot controls with either foot. Claimant is limited to no
> ladders, scaffolds, or stooping but is able to frequently balance. Claimant is
> able to frequently work at unprotected heights and around moving parts.
> Claimant is able to occasionally operate a motor vehicle and work with
> vibration. Claimant is able to work continuously around dust, odors, fumes,
> and pulmonary irritants. Claimant experiences a moderate limitation in her
> ability to interact appropriately with supervisors but is still able to function
> satisfactorily. Claimant experiences a mild limitation in her ability to interact
> appropriately with the public and co-workers. Claimant experiences a mild
> limitation regarding changes in work settings and in her ability to make
> judgments on complex work-related decisions.

AR 614. This RFC assessment was based on Ms. McDonald's testimony, opinions from treating,

examining, and nonexamining medical sources, and a statement from Ms. McDonald's husband.

AR 613-17. At several points in her decision, the ALJ adopted the analysis of the prior March 21,

2005 decision and incorporated that analysis into her opinion by reference. AR 613, 615, 617.

Based on the testimony of a vocational expert, the ALJ concluded that Ms. McDonald's

RFC enabled her to participate in occupations that exist in significant numbers in the national

economy, such as the job of food assembler or parking lot cashier. AR 618. Because the ALJ

concluded that Ms. McDonald is capable of gainful employment, the ALJ found that she was not

disabled within the meaning of the Social Security Act.

## ANALYSIS

Ms. McDonald contends that the ALJ's decision should be reversed because the ALJ

committed legal errors in reaching her decision and the decision is not based on substantial

evidence. Specifically, Ms. McDonald argues that the ALJ erred by improperly rejecting certain

medical source opinions, Ms. McDonald's own testimony, and a lay statement by her husband.

Ms. McDonald also alleges that the ALJ relied on flawed vocational expert testimony and failed

to consider all of Ms. McDonald's impairments at Step Two and beyond. Based on the following

analysis, I hold that the ALJ did not commit legal error and the ALJ's decision is supported by

substantial evidence in the record.

## I.    <u>Rejection of Medical Source Opinions</u>

Over the past ten years, Ms. McDonald's condition has been evaluated at least twenty-

four medical professionals: Dr. Salib, AR 652, 654; Dr. Schearer, AR 653; Dr. Shobe, AR 653;

Dr. Thibault, AR 653; Dr. Young, AR 654; Dr. Lawlor, AR 616; Dr. Lindquist, AR 655-56; Dr.

Johnson, AR 655-56; Dr. Moller, AR 656; Dr. Fraback, AR  656; Dr. Smith, AR 657; Dr.

Edelson, AR 657; Dr. Brischetto, AR 657; Dr. Pecoraro, AR 615; Dr. Chisholm, AR 615; Dr.

McDonald, AR 616; Dr. Eder, AR 616; Dr. Blackman, AR 693-94; Dr. Corbett, AR 616; Dr.

Gerry, AR 782-83; Dr. Dickenson, AR 616; Dr. Ogisu, AR 616-17; Dr. Halter, AR 778; and Dr.

Duckler, AR 617. Ms. McDonald argues that the ALJ erred by rejecting the opinions of seven of

these physicians: (1) state disability specialists Dr. Pecoraro and Dr. Chisolm; (2) psychologist

Dr. Halter; (3) testifying medical expert Dr. Duckler; (4) orthopedic surgeon Dr. Salib; (5) primary care physician Dr. Schearer; and (6) spinal specialist Dr. Lindquist. (Pl.'s Brief (#14) 16-25.)

If a treating or examining physician's opinion is controverted by the opinion of another physician, an ALJ must cite specific, legitimate reasons for rejecting the physician's opinion, and those reasons must be based on substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The sufficiency of the ALJ's reasons for rejecting a treating or examining physician's opinion depends on the source of the contravening opinion. For example, the opinion of an examining physician may be sufficient to reject a treating physician's opinion if the examining physician's opinion is based on independent clinical findings. *Andrews*, 53 F.3d at 1041. But an ALJ may not reject the opinion of an examining or treating physician by relying exclusively on the opinion of a nonexamining physician. *Lester*, 81 F.3d at 830. "The ALJ can meet [his or her] burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Colton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Where medical reports are inconclusive, "questions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary." *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982) (quoting *Waters v. Gardner*, 452 F.2d 855, 858 n.7 (9th Cir. 1971)).

The record reflects a vast body of medical opinions with varying conclusions about the nature and extent of Ms. McDonald's disability. The ALJ evaluated the record as a whole and rendered a decision that attempts to reconcile numerous conflicting medical opinions, some more

easily reconciled than others. Because opinions varied, the ALJ necessarily credited some

medical opinions at the expense of other opinions. When the ALJ considered a medical opinion

to be consistent with the record as a whole, including other phsyicians' opinions, the ALJ

assigned that aspect of the physician's opinion greater weight. For the reasons stated below, I find

no legal error in the ALJ's evaluation of medical sources.

A.       *Dr. Pecoraro and Dr. Chisolm*

Dr. Pecoraro is a nonexamining state agency physician who rendered an opinion about the

level of Ms. McDonald's impairment. After review, Dr. Pecoraro's opinion was affirmed by

another state agency physician, Dr. Chisolm. Ms. McDonald argues that the ALJ erred by

implicitly rejecting these doctors' opinions.

Contrary to Ms. McDonald's claims, the ALJ did not reject Dr. Pecoraro's or Dr.

Chisolm's opinions "entirely." (Pl.'s Opening Brief (#14) 17.) These doctors opined that Ms.

McDonald was capable of work, subject to certain limitations. AR 220-26. Neither confirmed

Ms. McDonald's claim that she must lie down periodically throughout the day. AR 220-26. In

fact, neither doctor concluded that Ms. McDonald must alternate positions every half an hour to

manage her pain, AR 220, an additional limitation that was included in the RFC, AR 614. The

doctors also failed to assess any postural limitations, AR 221, although several postural

limitations were included in the RFC, AR 614. Furthermore, when the ALJ posed these doctors'

assessment to the vocational expert as a hypothetical question, the expert testified that Ms.

McDonald would be able to continue in her past work despite those limitations. AR 220-23, 618,

892.

PAGE 6 - OPINION AND ORDER

Where the ALJ rejected Dr. Pecoraro's and Dr. Chisolm's opinions, she gave specific and legitimate reasons for doing so. In her RFC assessment, the ALJ rejected the opinions that Ms. McDonald can walk only two hours per day, and that she cannot engage in repetitive overhead work, foot controls, or vigorous controls of any kind. AR 615. The ALJ gave these opinions "moderate weight" but was more persuaded by later opinions that assessed slightly greater functionality in these areas. AR 615. Specifically, the ALJ credited the 2007 opinion of an examining physician, Dr. Ogisu, who opined that Ms. McDonald could sit four hours a day for thirty minutes at a time, stand four hours a day for thirty minutes at a time, and occasionally operate foot controls, push and pull with her hands, and reach overhead with her <u>left</u> hand. AR 617, 808-12.

Dr. Ogisu is an examining physician, which means his opinion is entitled to greater weight. *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990). The ALJ also assigned greater weight to Dr. Ogisu's opinion because it was rendered more recently. AR 615, 617. Although a more recent report is not necessarily entitled to greater weight, here, the ALJ was justified in assigning greater weight to Dr. Ogisu's more recent opinion because progress notes from other physicians suggested that Ms. McDonald's condition had changed between 2000 and 2007. AR 616, 750, 765, 782. Additionally, the ALJ gave greater weight to Dr. Ogisu's opinion because she found that Dr. Ogisu's opinion was "more consistent with the record as a whole." AR 617. The ALJ did not err in her evaluation of Dr. Pecoraro's and Dr. Chisolm's opinions.

**B.    *Dr. Halter***

Ms. McDonald argues that the ALJ erred by improperly rejecting the opinion of Dr.

Halter, a psychologist who treated Ms. McDonald on approximately six occasions. AR 769-80, 818-22. The ALJ did not reject Dr. Halter's opinion, however, because the ALJ's findings are not inconsistent with Dr. Halter's opinion.

Dr. Halter expressed three opinions on Ms. McDonald's condition. First, Dr. Halter diagnosed Ms. McDonald with a single episode of severe major depressive disorder.[3] AR 778. Second, he diagnosed her with "chronic pain." AR 778. Third, he assigned a Global Assessment of Functioning ("GAF") score of 45 after Ms. McDonald's first visit on August 14, 2007, AR 778, but assigned a higher GAF score of 56 after subsequent visits, AR 820.

By assigning Ms. McDonald a GAF score, Dr. Halter expressed an opinion about functional limitations attributable to Ms. McDonald's major depressive disorder.[4] But contrary to Ms. McDonald's assertion, the ALJ did not reject Dr. Halter's GAF score assessment of 45. Rather, Dr. Halter revised his own assessment by issuing a new GAF score of 56 on September 26, 2007. AR 820. A GAF score between 51 and 60 indicates "[m]oderate symptoms" or "any moderate difficulty in social, occupational, or school functioning." *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000). This is consistent with the RFC, which reflects a "moderate limitation in [Ms. McDonald's] ability to interact appropriately with supervisors." AR

---

[3]  Dr. Halter indicated his diagnosis with Axis I diagnostic code 296.23, which corresponds to "Major Depressive Disorder, Single Episode, Severe Without Psychotic Features." *Diagnostic and Statistical Manual of Mental Disorders* 370, 375, 413 (4th ed. 2000).

[4]  The GAF scale "does not have a direct correlation to the severity requirements in [the Commissioner's] mental disorders listings." 65 Fed. Reg. 50,746, 50,765 (Aug. 21, 2000). I consider the ALJ's treatment of Dr. Halter's GAF score only to the extent the score reflects Dr. Halter's opinion about the extent of Ms. McDonald's functional limitations.

614. In fact, the ALJ found that Ms. McDonald experiences mild to moderate difficulty in a wide range of social and occupational situations. AR 613-14. Dr. Halter's opinion is also consistent with the ALJ's conclusion that Ms. McDonald did not experience "marked difficulty" in activities of daily living, social functioning, or concentration because a marked limitation is defined as a limitation that is "*more than* moderate but less than extreme." AR 613-14, 20 C.F.R. Part 404, Subpart P, Appendix 1 (emphasis added). The ALJ also determined that Ms. McDonald suffers from several "severe impairments," including degenerative disc disease, degenerative joint disease, and possible fibromyalgia, AR 613, all of which are consistent with Dr. Halter's diagnosis of chronic pain.[5] The consistencies between the RFC and Dr. Halter's opinion demonstrate that the ALJ did not reject Dr. Halter's opinion.

**C.    *Dr. Duckler***

Ms. McDonald argues that the ALJ improperly rejected the opinion of Dr. Duckler, a nonexamining physician who testified at Ms. McDonald's hearing on August 15, 2007. AR 855-64, 874-75. The ALJ credited Dr. Duckler's opinions to the extent those opinions were consistent with the opinions of Ms. McDonald's examining physicians, AR 617, but did not credit his opinions when they were contradicted by the more heavily weighted opinions of examining physicians. Because Dr. Duckler did not examine Ms. McDonald, AR 855, his opinion is entitled to less weight than the opinion of an examining physician. *Pitzer*, 908 F.2d at 506 n.4. Therefore, the ALJ did not err by failing to credit Dr. Duckler's opinion to the extent his opinion was

---

[5]  In any event, Dr. Halter's opinion that Ms. McDonald suffers from chronic pain is entitled to "little if any weight" because Ms. McDonald's physical impairments are beyond his area of specialization. *See Holohan v. Massanari*, 246 F.3d 1195, 1202 n.2 (9th Cir. 2001) (citing 20 C.F.R. § 404.1527(d)).

controverted by the opinions of examining physicians. *Id.*

**D.     *Dr. Salib***

Ms. McDonald argues that the ALJ improperly rejected the opinions of Dr. Salib, a

physician who treated Ms. McDonald in 1999 and 2000. AR 278-84. After four visits and a few

additional consultations with specialists, Dr. Salib signed a U.S. Department of Housing and

Urban Development ("HUD") form indicating that Ms. McDonald qualified for subsidized

housing assistance because she was disabled within the meaning of the Social Security Act. AR

515-16. The HUD form described this disability as an "inability to engage in any substantial

gainful activity because of any physical or mental impairment that is . . . expected to last

continuously for at least 12 months." AR 515-16.

In evaluating the opinion of Dr. Salib, the ALJ addressed both Dr. Salib's objective

findings and the HUD form. The ALJ rejected the HUD form as conclusive evidence of disability

both because "[a] statement made to help qualify a person for other forms of public assistance

does not establish disability" within the meaning of the Social Security Act, AR 652, and because

"the objective treatment records from [Dr. Salib] provide findings and assessments fully

inconsistent with disability." AR 652-53. The ALJ supported her conclusion with substantial

evidence in the record. Dr. Salib noted degeneration at "all levels" of Ms. McDonald's spine, but

he found no nerve root compression or disc herniation. AR 280, 283, 654. Despite Ms.

McDonald's claim that her symptoms had steadily worsened over time, her MRI images looked

"virtually the same" as they had in the past. AR 280, 283, 654. Furthermore, Dr. Salib's findings

and observations express no opinion on the extent of Ms. McDonald's functional limitations. AR

PAGE 10 - OPINION AND ORDER

278-84, 654. The ALJ did not err in rejecting Dr. Salib's unsupported opinion that Ms. McDonald was disabled.

  **E.**  ***Dr. Schearer***

  Ms. McDonald argues that the ALJ also improperly rejected Dr. Shearer's opinion that she is disabled. While Ms. McDonald lived in Minnesota, Dr. Shearer treated her for back pain, headaches, and weight gain. AR 286-300. During the treating relationship, Dr. Shearer wrote Ms. McDonald a note telling her employers that she should not lift more than twenty pounds or do any repeat bending for six months because of her back pain. AR 293. Several of Dr. Shearer's clinical notes indicate that Ms. McDonald's back continued to improve as she lost weight and engaged in physical therapy. AR 292, 294. After a period of improvement, however, Ms. McDonald began reporting pain in her legs, as well as her back. AR 288, 290-91. Around October 2000, Ms. McDonald moved from Minnesota to Oregon and began seeing another treating physician, Dr. Young. AR 321. From December 2000 to January 2001, Ms. McDonald repeatedly asked Dr. Young to sign a "Total and Permanent Disability Cancellation Request" designating her as disabled and relieving her of liability for her student loans. AR 306, 310, 314, 320, 343, 653, 655. He refused. AR 306, 310, 314, 320. Ms. McDonald then asked Dr. Schearer to sign the form, and he signed it almost a year after his treating relationship with Ms. McDonald ended. AR 343, 572.

  The ALJ cited specific, legitimate reasons for rejecting Dr. Shearer's opinion, and those reasons are based on substantial evidence in the record. *See Andrews*, 53 F.3d at 1041. First, the ALJ concluded that Dr. Schearer's disability opinion was not supported by his objective findings

because Ms. McDonald's symptoms improved during the treatment relationship. AR 289, 292, 653-54. Second, the ALJ noted that an opinion rendered for the purpose of relieving student loan obligations does not necessarily establish disability under the Social Security Act. AR 652-54.

Third, the circumstances surrounding the note were, in the ALJ's opinion, "highly suspect." AR 653. Specifically, the ALJ noted that Dr. Shearer signed the loan form even though he had not treated Ms. McDonald for almost a year. AR 653. Also, the ALJ also considered the fact that Dr. Shearer signed the loan form only after Ms. McDonald's current treating physician, Dr. Young, refused to sign because he did not believe that Ms. McDonald was disabled. AR 306, 653, 655. Dr. Young's treating physician opinion, which intervened between Dr. Schearer's relationship with Ms. McDonald and the time when Dr. Schearer signed the loan form, is itself a specific and legitimate reason to reject Dr. Schearer's opinion. The ALJ did not err in rejecting Dr. Schearer's opinion, to the extent Dr. Schearer expressed an opinion by signing the form.

### F.    *Dr. Lindquist*

Ms. McDonald argues that the ALJ erred by discrediting the opinion of treating physician Dr. Lindquist without providing specific, legitimate reasons for doing so. *See Andrews*, 53 F.3d at 1041. Dr. Lindquist, a spinal specialist who treated Ms. McDonald between 2001 and 2004, assessed more functional limitations than any other treating or examining physician. AR 346, 655-58. Most significantly, Dr. Lindquist opined that Ms. McDonald's need to recline was "reasonably consistent with the nature and severity of her medical impairment(s)," that Ms. McDonald could only sit for two hours a day and for twenty minutes at a time, and that Ms. McDonald's symptoms could cause her to be absent from work more than three times a month.

AR 346-47.

The ALJ cited several specific reasons for rejecting Dr. Lindquist's opinion. The ALJ noted that Dr. Lindquist's opinion was "clearly inconsistent with, and unsupported by, [her] objective findings" and the findings of several other physicians. AR 656, 658. The decision describes these inconsistencies, which are supported by substantial evidence in the record. For example, around the time she signed a "check-off" form assessing Ms. McDonald's limitations, Dr. Lindquist's progress notes admitted that Ms. McDonald's "lower extremity pain and numbness has not been adequately sorted out yet" and that Ms. McDonald's "radiculopathy (nerve compression)" was "presumed." AR 348, 656. This presumption of radiculopathy is directly contradicted by the opinions of specialists who examined Ms. McDonald, many of whom did so at Dr. Lindquist's request. No specialist found a medical source for the radicular leg pain and numbness Ms. McDonald described. Dr. Johnson, a neurosurgeon, noted that stenotic changes were not "responsible for the amount of pain and numbness [Ms. McDonald] is having." AR 333, 655. In Dr. Lindquist's own words, Dr. Johnson, was "underimpressed" with his examination of Ms. McDonald's CT myelogram and "felt the changes on the CT myelogram . . . were essentially mild and not commensurate with [Ms. McDonald's] level of symptoms." AR 348, 656. Dr. Lindquist further observed that Dr. Johnson's conclusions were consistent with "EMG/nerve conduction studies" conducted in Minnesota. AR 348, 656. This statement likely refers to the opinion of Dr. Salib, who examined several of Ms. McDonald's MRI exams and found no nerve root compression or disc herniation and no significant changes from year to year. AR 280, 283, 654, 656.

The ALJ also found that Dr. Lindquist's assessment of Ms. McDonald's limitations was inconsistent with the opinions of every other physician who evaluated Ms. McDonald's condition. AR 658. Dr. Schearer opined that Ms. McDonald's only limitations were lifting more than twenty pounds and bending repeatedly. AR 293. Another treating physician, Dr. Young, disagreed that Ms. McDonald was disabled. AR 306, 655. Dr. Young's opinion was based primarily on the opinion of Dr. Lawlor, a physiatrist, who opined that Ms. McDonald "could be more functional than she indicates" if she were motivated to follow through with a combination of physical therapy and narcotic pain medications. AR 616, 817. Dr. Pecoraro, Dr. McDonald, and Dr. Ogisu all assessed a greater level of functionality than did Dr. Lindquist. AR 220-23, 227-32, 615-17, 807-12.

The ALJ found inconsistencies between Dr. Lindquist's opinion and the findings and opinions of several other treating, examining, and reviewing physicians. These inconsistencies are specific and supported by substantial evidence in the record. Therefore, the ALJ did not err by rejecting Dr. Lindquist's opinion.

## II.    Rejection of Plaintiff's Testimony

Ms. McDonald argues that the ALJ improperly discredited her testimony about the debilitating effects of her pain. Here, the ALJ determined that Ms. McDonald's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," but discredited Ms. McDonald's testimony "concerning the intensity, persistence and limiting effects of these symptoms . . . to the extent they are inconsistent" with other evidence in the record. AR 615. This decision was based on perceived inconsistencies between Ms. McDonald's testimony

PAGE 14 - OPINION AND ORDER

and the observations of her doctors, as well as Ms. McDonald's inadequately explained failure to follow several doctors' prescribed courses of treatment. The ALJ also cited specific activities Ms. McDonald performs that make her testimony less credible, such as a two-day car trip to Minnesota twice a year, and testimony from her husband that suggests a higher level of functionality than she described.

Credibility determinations are the province of the ALJ, *Magallanes*, 881 F.2d at 750, but the ALJ must cite "a specific, cogent reason" for discrediting a claimant's testimony, *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990). Where there is medical evidence of an underlying medical impairment, the ALJ "may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (en banc) (citation omitted). If the ALJ finds that the claimant's allegations of severity are not credible, the ALJ must make "specific findings stating clear and convincing reasons" that support her conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *See also Bunnell*, 947 F.2d at 345. "[U]nexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment" may be a reason to discredit a claimant's testimony. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). The ALJ may also consider prior inconsistencies in the claimant's testimony, the claimant's daily activities, and observations of physicians and lay witnesses. *Smolen*, 80 F.3d at 1284-85.

The ALJ noted that Ms. McDonald's complaints were not consistent with objective medical findings of her physicians. AR 656. Although many doctors diagnosed Ms. McDonald with degenerative disc disease responsible for her back pain, none found a medical explanation

for the radicular leg pain she described. AR 654, 656, 658, 806. For example, Dr. Salib examined Ms. McDonald and several of her MRI films but found no nerve root compression or disc herniation and no significant changes in the MRI films from year to year. AR 280, 283, 654. His opinion is supported by the opinions of Dr. Shobe and Dr. Thibault. AR 236, 254, 653-54. Dr. Johnson opined that he did "not believe that stenotic changes could be responsible for the amount of pain and numbness alleged," AR 333, 655, and his objective findings were "not commensurate with the claimant's level of symptoms," AR 348, 656. Dr. Lawlor, a physiologist who examined Ms. McDonald and stated that Ms. McDonald "could be more functional than she indicated if she were motivated to pursue the appropriate exercises along with medication." AR 616, 816. Dr. Dickenson agreed with these assessments, noting that the level of Ms. McDonald's impairment was not supported by "history, physical findings, or laboratory findings" and there was likely a psychological component to her limitations. AR 616, 796-97.

The ALJ also considered a report from Dr. Brischetto, a psychologist who examined Ms. McDonald, and observed that "[a] substantial amount of the information reported by the claimant to Dr. Brischetto is shown to be either inaccurate or untrue." AR 657. For example, Dr. Brischetto noted that Ms. McDonald's memory was better than she had alleged, that she may have been underperforming on memory tests, and that Ms. McDonald mistakenly represented that she had never taken anti-depressants in the past. AR 529, 531, 657.[6] Dr. Brischetto diagnosed Ms. McDonald as exhibiting histrionic features. AR 536, 658, 863. Although Dr.

---

[6] Although I disagree that the quantity or severity of Ms. McDonald's misstatements to Dr. Brischetto can fairly be described as "substantial," the ALJ properly considered these misstatements as one of several reasons supporting her decision to discredit Ms. McDonald's testimony.

PAGE 16 - OPINION AND ORDER

Duckler later characterized Dr. Brischetto's statement as "a little harsh," and possibly indicative

of prejudice, he found nothing in the record to contradict Dr. Brischetto's conclusions, AR 617,

862-64.

     Ms. McDonald also demonstrated an unexplained, or inadequately explained, failure to

follow through with her doctors' recommended courses of treatment. *See Fair*, 885 F.2d at 603.

The ALJ noted that Ms. McDonald "takes a passive role in her own treatment, does not follow

some very reasonable suggestions . . . and has not tried other avenues of treatment for factors that

would affect any ordinary individual." AR 658. Although Ms. McDonald claimed that her

physicians told her that the more activity she performs, "the more rapidly the [degenerative disc]

disease will progress and worsen," the ALJ found no evidence supporting this statement. AR

189, 279-84, 654. Rather, the ALJ noted that Ms. McDonald frequently refused physical therapy,

despite her doctors' recommendations, primarily because "she did not find it helpful." AR 234,

307, 655. Even though Ms. McDonald asserted that "nothing works" to alleviate her pain, her

progress notes reflect that certain procedures and therapies improved her condition. AR 656, 750,

765, 782. These conclusions are amply supported by the record, which shows that Dr. Salib, AR

282, 654; Dr. Shobe, AR 234, 653; Dr. Thibault, AR 251, 654; Dr. Young, AR 307, 654-55; Dr.

Lawlor, AR 616, 815; and Dr. Corbett, AR 616, 744, 738, all recommended physical therapy,[7]

that Ms. McDonald did not follow a consistent physical therapy regimen, AR 232, 234, 616, 738,

---

     [7] A reviewing physician, Dr. McDonald, also observed that "[t]reating sources have
consistently prescribed [physical therapy] exercises as the recommended course of treatment" but
Ms. McDonald had not followed through on that treatment. AR 231-32, 616. Dr. Dickenson, an
examining physician, thought that Ms. McDonald lacked "plans or strategies for trying to
improve her conditions and/or lesson the impact of her reported complaints upon her everyday
quality of life." AR 616, 791.

802, and that Ms. McDonald's symptoms actually improved during the brief periods in which she

tried physical therapy, AR 239-40, 435-36, 616, 653, 765, 766.

In further support of her decision, the ALJ noted that McDonald takes 1700-mile car trips

from Oregon to Minnesota twice a year to visit family. AR 651. The ALJ determined that these

two-day trips were inconsistent with the severe symptoms and limitations Ms. McDonald

described, even though Ms. McDonald alleges she reclines and sleeps during the entire trip. AR

651, 658. Specifically, the long trips undermine Ms. McDonald's assertion that she has difficulty

driving, that sitting for more than ten minutes is painful, and that she has difficulty maintaining

any one position for a significant length of time. AR 42, 52, 535, 564, 575-77, 579, 651-53, 658,

803.

The ALJ also considered a statement from Ms. McDonald's husband, Keith McDonald. In

evaluating Mr. McDonald's statement, the ALJ noted that Mr. McDonald's report was

"considered credible to the extent that [he] would honestly describe observed behavior and what

he has been told." AR 652. But, despite crediting Mr. McDonald's testimony, the ALJ also noted

that "Mr. McDonald describes a functional level which is greater than that alleged by claimant."

AR 652. Specifically, the ALJ contrasted Mr. McDonald's observations that Ms. McDonald

"shops for groceries twice a month; leaves the residence once or twice a week; visits with

neighbors daily; cares for her daughter; has no problems driving; watches about 2 hours of TV a

day; and attends to her own grooming" with Ms. McDonald's testimony that she is unable to sit,

stand, or lift anything for more than a couple of minutes at a time, unable to drive for more than

ten minutes, unable to walk a half block, and sometimes unable to wash her hair. AR 52-53, 133-

37, 190-201, 651-52.

In sum, the ALJ cited several clear and convincing reasons to disbelieve Ms. McDonald's testimony that her pain requires her to lie down frequently during the day and prevents her from engaging in almost all activity. These reasons are supported by substantial evidence in the record. Therefore, the ALJ did not err in discrediting Ms. McDonald's testimony.

**III.    Rejection of Lay Witness Statement**

Ms. McDonald argues that the ALJ erred by failing to credit her husband's lay witness testimony. The ALJ has a duty to consider lay witness testimony. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001); 20 C.F.R. §§ 416.913(d)(4); 416.945(a)(3). The ALJ may not reject such testimony without comment, but she may reject lay testimony inconsistent with medical evidence. *Lewis*, 236 F.3d at 511. If an ALJ rejects lay witness testimony entirely, she must give reasons for doing so. *Nguyen v. Chater*, 100 F.3d at 1462, 1467 (9th Cir. 1996).

Rather than rejecting or discrediting Mr. McDonald's testimony entirely, the ALJ noted that Mr. McDonald's report was "considered credible to the extent that [he] would honestly describe observed behavior and what he has been told." AR 617, 652. In partially crediting Mr. McDonald's opinion, the ALJ observed that "Mr. McDonald describes a functional level which is greater than that alleged by claimant" AR 652. As discussed above, this conclusion is supported by substantial evidence in the record  AR 52-53, 133-37, 190-201, 651-52. As for the ALJ's decision to reject the more significant functional limitations Mr. McDonald observed, the ALJ properly considered the fact that Mr. McDonald reported only his observations of Ms. McDonald's daily activities rather than objective findings related to her medical condition. AR

PAGE 19 - OPINION AND ORDER

617, 652. The ALJ did not err in her evaluation of Mr. McDonald's testimony.

**IV.    <u>Reliance on Vocational Expert Testimony</u>**

Ms. McDonald argues that the ALJ committed two errors with respect to her evaluation

of vocational expert testimony. First, she asserts that the ALJ posed a "incomplete and improper"

hypothetical question to the expert. (Pl.'s Brief (#14) 29-30.) This argument is based primarily on

the fact that the ALJ did not pose a hypothetical question that contained the limitations Dr.

Lindquist described, such as a need to recline periodically throughout the day and miss several

days of work each month. (*Id.*) Second, she argues that the expert's testimony impermissibly

conflicts with the Dictionary of Occupational Titles ("the DOT guidelines"), as described in 20

C.F.R. §§ 404.1567 and 416.967. For the reasons stated above, I find no error in either the

vocational expert's testimony or the ALJ's evaluation of the testimony.

The limitation of evidence in a hypothetical question is objectionable "only if the

assumed facts could not be supported by the record." *Sample*, 694 F.2d at 644. Here, one of the

ALJ's hypothetical questions was taken word-for-word from her final RFC assessment ("RFC").

AR 614, 896-97. The ALJ further noted that she posed an additional hypothetical based

specifically on the findings of state agency physicians Dr. McDonald and Dr. Pecararo. AR 618,

894. The vocational expert testified that Ms. McDonald could perform work under either

hypothetical scenario. AR 618, 894-95, 896-97. For reasons already given, the restrictions

contained in the ALJ's RFC are supported by substantial evidence the record. Because the ALJ

properly rejected Dr. Lindquist's opinion, as discussed above, the ALJ did not err by failing to

pose a hypothetical question that contained the functional limitations Dr. Lindquist assessed.

Neither the record nor the DOT guidelines support Ms. McDonald's second argument. Although Ms. McDonald asserts that "[e]ven the ALJ agrees that [Ms. McDonald] is incapable of all aspects of Light work" (Pl. Brief (#14) 31), she is mistaken. The ALJ specifically found that Ms. McDonald "has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)," subject to certain enumerated limitations. AR 614. Under 20 C.F.R. §§ 404.1567(b) and 416.967(b), "light work" is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

The ALJ's RFC is consistent with the DOT guidelines because it limits Ms. McDonald to lifting up to twenty pounds occasionally but places no limitation on her ability to lift up to 10 pounds. AR 614. The RFC also indicates that Ms. McDonald is capable of occasionally pushing and pulling with either extremity, as well as occasionally operating foot controls. AR 614. Furthermore, because the RFC prevents Ms. McDonald from performing all work within the "light work" category, the ALJ specifically asked which, if any jobs, Ms. McDonald could perform. AR 618. The vocational expert testified that Ms. McDonald could perform work as food assembler or as a parking lot cashier. The job of "parking lot cashier" is not impermissibly "broad" and "generic," as Ms. McDonald claims. (Pl.'s Brief (#14) 32.) According to DOT code 211.462-010, available at http://www.stepfour.com/jobs/v2/211462010.htm, cashiers "[m]ay be designated according to nature of establishment"—including a designation as a "Parking Lot" cashier. Neither the ALJ nor the vocational expert deviated from the DOT guidelines.

PAGE 21 - OPINION AND ORDER

**V.**    **Failure to Consider All Impairments at Step Two and Beyond**

Ms. McDonald argues that the ALJ erred by "failing to identify or consider [Ms. McDonald's] obesity, pain disorder associated with both psychological factors and a general medical condition, the sedating side-effects of her pain and anti-nausea medications, bursitis of the hips, and lateral epicondylitis as severe impairments." (Pl.'s Brief (#14) 33.) The record does not support her arguments.

With respect to Ms. McDonald's obesity, the ALJ found that, "while [Ms. McDonald] is overweight, the degree of obesity is not severe." AR 650. The ALJ discussed Ms. McDonald's bursitis of the hips, AR 649-51, and considered Ms. McDonald's testimony about the side effects of her pain and anti-nausea medication. AR 651-53. The ALJ afforded significant weight to Dr. Dickenson's opinion, which specifically diagnosed Ms. McDonald with "pain disorder associated with psychological factors and a general medical condition," AR 616, 796, and to Dr. Ogisu's opinion, which specifically found lateral epicondylitis, AR 616-17, 803, 807. The record reflects full consideration of Ms. McDonald's impairments throughout the five-step process.

## CONCLUSION

The Commissioner's decision that Ms. McDonald does not suffer from disability and is not entitled to benefits under Title II of the Social Security Act is based upon correct legal standards and supported by substantial evidence. Therefore, the Commissioner's decision is AFFIRMED and Ms. McDonald's appeal is DISMISSED.

IT IS SO ORDERED.

Dated this   4th   day of January, 2010.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge